APPEAL NO. 13-1779
_____

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

QUINTON BROWN, JASON GUY, RAMON ROANE, ALVIN
SIMMONS, SHELDON SINGLETARY, GERALD WHITE, and
JACOB RAVENELL, individually and on behalf of the class they
seek to represent,

       Plaintiffs-Appellants,

v.

NUCOR CORPORATION and NUCOR STEEL-BERKELEY,

       Defendants-Appellees.

_____

## ON APPEAL FROM THE UNITED STATES
## DISTRICT COURT FOR THE
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

_____
_____

## BRIEF FOR PLAINTIFFS-APPELLANTS
_____

| | |
|---|---|
| Armand Derfner | Robert L. Wiggins, Jr. |
| D. Peters Wilborn, Jr. | Ann K. Wiggins |
| Derfner, Altman & Wilborn | Wiggins, Childs, Quinn & |
| 40 Calhoun Street, Suite 410 | Pantazis LLC |
| Charleston, S.C. 29402 | The Kress Building |
| (843) 723-9804 | 301 19th Street North |
| | Birmingham, Alabama 35203 |
| | 205-314-0500 |

## ATTORNEYS FOR PLAINTIFFS-APPELLANTS

**APPEAL NO. 13-1779**
**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

QUINTON BROWN, JASON GUY,
RAMON ROANE, ALVIN SIMMONS,
SHELDON SINGLETARY,
GERALD WHITE, and  JACOB
RAVENELL, individually and
on behalf of the class they seek to
represent,

              Plaintiffs-Appellants,

v.

NUCOR CORPORATION and
NUCOR STEEL-BERKELEY,

              Defendants-Appellees.

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Counsel for Appellants certifies that the following is a complete list of the trial judges; attorneys involved in the case; and all persons, associations of persons, firms, partnerships, and corporations having an interest in the outcome of this case:

1.    Plaintiff-Appellants: Quinton Brown, Jason Guy, Ramon Roane, Alvin Simmons, Sheldon Singletary, Gerald White, and  Jacob Ravenell, individually and on behalf of the class they seek to represent;

C-1 of C-2

*Brown, et al. v. Nucor Corp.*, et al.
Appeal No. 13-1779

2.      Cary A. Farris, J. Shannon Gatlin, John K. Linker, and the attorneys working for or with the firm of Alaniz & Schraeder, LLP attorneys for the defendants-appellees;

3.      Armand Derfner, D. Peters Wilborn, Jr. and the attorneys working for or with the firm of Derfner, Altman & Wilborn, attorneys for the plaintiffs-appellants;

4.      Robert L. Hodges, John Tracy Walker, IV, and the attorneys working for or with the firm of McGuire Woods LLP, attorneys for defendant-appellees;

5.      Honorable C. Weston Houck,  United States District Judge;

6.      John S. Wilkerson, III, Nosizi Ralephata, and the attorneys working for or with the firm of Turner Padgett Graham & Laney PA, attorneys for defendants-appellees;

7.      Nucor Corporation, defendant-appellee;

8.      Nucor Steel Berkeley, defendant-appellee;

9.      Robert L. Wiggins, Jr., Ann K. Wiggins, and the attorneys working for or with the firm of Wiggins, Childs, Quinn and Pantazis, LLC, attorneys for plaintiffs-appellants.

C-2 of C-3

*Brown, et al. v. Nucor Corp.*, et al.
Appeal No. 13-1779

    10.    John S. Wilkerson, III, Nosizi Ralephata, and the attorneys working for

or with the firm of Turner, Padget, Graham & Laney, P.A. attorneys for the

defendants-appellees.

                                s/Robert L. Wiggins, Jr.
                                Of Counsel

C-3 of C-3

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1A, Appellants, states the following:

1.     All parent corporations, if any, of the named party: None.

2.     All publicly held companies, if any, that own ten percent (10%) or more of the named party's stock: None.

# TABLE OF CONTENTS

**PAGES:**

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . C-1 - C-3

CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.    STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  STATEMENT OF CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

IV.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.    Size And Organization Of The Berkeley Plant . . . . . . . . . . . . . . . 3

       B.    The Statistics Demonstrating Plantwide Racial Disparities In
             Promotion Did Not Change On Remand . . . . . . . . . . . . . . . . . . . . . 4

       C.    The Evidence Was Sufficient Across All Six Production
             Departments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

             1.    Ample Non-Beam Mill Anecdotal Evidence Was Before
                   The Court In The First Appeal . . . . . . . . . . . . . . . . . . . . . . . 10

             2.    The Plant's General Manager Was Heavily Involved In
                   A Series Of Promotions To Supervisory Jobs Sought
                   By Black Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# TABLE OF CONTENTS

**PAGES:**

3.    The Court Found That A Common Promotion Procedure
      Was Used Throughout The Plant . . . . . . . . . . . . . . . . . . . . . 23

4.    The Racial Bias In Promotions Found In The Beam
      Mill Adversely Affected Promotion Opportunities
      Throughout All Six Production Departments . . . . . . . . . . . 25

D.    A Pattern Of Racial Hostility Was Found To Extend Throughout
      All Six Promotion Departments . . . . . . . . . . . . . . . . . . . . . . . . . 27

V.    SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

VI.   STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

I.    DISCUSSION OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

A.    The District Court's Rejection Of The Appellate Mandate And
      Adoption  Of The Dissenting Opinion Does Not Come Within
      The "Rare" And "Extraordinary" Exceptions To The Mandate
      Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

B.    The District Court Erred By Requiring Plaintiffs To Show
      They Will Prevail On The Merits . . . . . . . . . . . . . . . . . . . . . . . . . 34

C.    The District Court Abused Its Discretion And Clearly
      Erred By Rejecting The Statistical Evidence That This
      Court Held Sufficient As A Matter Of Law . . . . . . . . . . . . . . . . . 39

D.    The District Court Erred And Abused Its Discretion By
      Repudiating The Anecdotal Evidence That This Circuit
      Held To Be Sufficient For Class Certification . . . . . . . . . . . . . . . 42

-iii-

# TABLE OF CONTENTS

**PAGES:**

E.    The Decision In *Wal-Mart* Did Not Change The Law Applied
     In This Court's Prior Mandate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

F.    Nucor's *Ex Parte* Affidavits From Selected Class
     Members Were Waived In The First Appeal And Not
     A Proper Basis For Not Following This Court's Mandate
     On Remand . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

G.    Nucor's *Ex Parte* Affidavits Show That The Pattern-Or-Practice
     Extends Throughout All Six Production Departments . . . . . . . . . . . 52

H.    The Affidavits Taken  By Nucor's Attorneys Were Inherently
     Coercive and Misleading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . 61

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

# TABLE OF AUTHORITIES

**PAGES:**

*A Helping Hand LLC v. Baltimore County, Maryland,*
    515 F.3d 356 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Abdallah v. Coca Cola Co.,*
    186 F.R.D. 672 (N.D. Ga. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

\* *Amgen, Inc. v. Connecticut Retirement Plans & Trust Funds,*
    133 S.Ct. 1184 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 35, 38

*Bowers v. The Bunker Hill Co.,*
    689 F. Supp. 1032 (E.D. Wash. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Braun v. Wal-Mart Stores, Inc.,*
    2003 WL 1847695 (Pa. Com. Pl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

\* *Brown v. Nucor Corp.,*
    576 F.3d 149 (4th Cir. 2009), *cert. denied* 130 S. Ct. 1720 (2010) . . *passim*

*Bublitz v. E. I. Dupont,*
    196 F.R.D. 545 (S.D. Iowa 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Christianson v. Colt Industries Op. Group,*
    486 U.S. 800 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Conway v. Electro Switch Corp.,*
    825 F.2d 593 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

*Cooper v. Federal Reserve Bank,*
    467 U.S. 867 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Cox v. American Cast Iron Pipe,*
    784 F.2d 1546 (11th Cir. 1986), *cert. denied,* 479 U.S. 883 (1987) . . . 55, 56

# TABLE OF AUTHORITIES

**PAGES:**

*Doe v. Chao*,
     511 F.3d 461 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Dothard v. Rawlinson*,
     433 U.S. 321 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Ealy v. Pinkerton Government Services*,
     514 Fed. Appx. 299 (4th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*EEOC. v. Mitsubishi Motor Mfg. of America, Inc.,*
     960 F.Supp. 164 (C.D.Ill.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*EEOC v. Morgan Stanley & Co., Inc.,*
     206 F. Supp. 2d 559 (S.D. N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . 59, 60

*EEOC v. Sears Roebuck & Co.*,
     243 F.3d 846 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Eisen v. Carlisle & Jacquelyn*,
     417 U.S. 156 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Estes v. Dick Smith Ford, Inc.*,
     856 F.2d 1097 (8th Cir 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Gene & Gene LLC v. Biopay LLC*,
     624 F.3d 698 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*General Telephone Co. v. Falcon*,
     457 U.S. 147 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Gunnells v. Healthplan Services, Inc.*,
     348 F.3d 417 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Hunter v. Allis-Chalmers Corp.*,
     797 F.2d 1147 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

# TABLE OF AUTHORITIES

**PAGES:**

*In Re Air Crash Disaster Near Roselawn*,
  909 F. Supp. 1116 (N.D. Ill. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 60

*In re Whirlpool Corp. Front-Loading Washer Product Litigation*,
  2013 U.S. App. LEXIS 14519 (6th Cir. 2013) . . . . . . . . . . . . . . . . . . . 36, 37

*Klay v. All Defendants*,
  389 F.3d 1191 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Kleiner v. The First National Bank of Atlanta*,
  751 F.2d 1193 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Koskowski v. Hampton Sch. Bd.*,
  77 Fed. Appx. 133 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Lilly v. Harris-Teeter Supermarket*,
  720 F2d 326 (4th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 37

*Martin v. Cavalier Hotel Corp.*,
  48 F.3d 1343 (4th Cir. 1995 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*McCallum  v. CSX Transp.*, Inc.,
  149 F.R.D. 104 (M.D. N.C. (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Messner v. Northshore Univ. HealthSys.*,
  669 F.3d 802 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Mevorah v. Wells Fargo Home Mtg.*,
  2005 U.S.LEXIS 28615 (N.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Mullen v. Princess Anne Volunteer Fire Co., Inc.*,
  853 F.2d 1130 (4th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46, 54

# <u>TABLE OF AUTHORITIES</u>

### <u>PAGES:</u>

*Mulligan v. South Carolina Dept. of Transp.*,
   446 F.Supp.2d  446 (D.S.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Polanco v. City of Austin, Texas*,
   78 F.3d 968 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

* *Quezada v. Schneider Logistics*,
   2013 U.S. Dist. LEXIS 47632 (C.D. Cal. Mar. 25, 2013) . . . . . . . . .  58, 59

*Ralph Oldsmobile, Inc. v. General Motors Corp.*,
   2001 WL 1035132 (S.D.N.Y. Sept.7, 2001) . . . . . . . . . . . . . . . . . . . . . . . . 60

*Robinson v. Runyon*,
   149 F.3d 507 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*S. Atl. Ltd. P'ship of Tenn., LP v. Riese*,
   356 F.3d 576 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Sejman v. Warner-Lambert Co.*,
   845 F.2d 66, 69 (4th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Sprague v. Ticonic Nat'l Bank*,
   307 U.S. 161 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Spulak v. K-Mart Corp.*,
   894 F.2d 1150 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Teamsters v. United States*,
   431 U.S. 324 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 55, 56

*Thorn v. Jefferson Pilot Life Ins. Co.*,
   445 F.3d 311 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## <u>TABLE OF AUTHORITIES</u>

<u>PAGES:</u>

*United States v. Barnes*,
   660 F.3d 1000 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States  v. Bell*,
   5 F.3d 64 (4th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33, 34, 51

*United States v. Becerra*,
   155 F.3d 740 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Kelly*,
   64 Fed. Appx. 361 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*U. S. v. O'Dell*,
   320 F.3d 674 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Pileggi*,
   703 F.3d 675, 679 (4th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 51

*United States v. Turner*,
   436 Fed. Appx. 599 (6th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*U. S. v. Williams*,
   162 Fed. Appx. 254 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States Postal Service Board of Governors v. Aikens*,
   460 U.S. 711(1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Walker v. Kelly*,
   589 F.3d 127 (4th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

* *Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## <u>TABLE OF AUTHORITIES</u>

<u>PAGES:</u>

*Warren v. Halstead Ind., Inc.*,
  802 F.2d 746 (4th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

\* *Williams v. Con Agra*,
  378 F.3d 790 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

**STATUTES:**

Federal Rule of Civil Procedure 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**OTHER AUTHORITIES:**

Seventh Amendment to the Constitution  . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

*ABA Formal Opinion* #91-359  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*ABA Informal Opinion*  #908 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Hazard & Hodes, THE LAW OF LAWYERING, §4.3:102 . . . . . . . . . . . . . . . . 60

S. C. Rules of Professional Conduct, Rule 4.3  . . . . . . . . . . . . . . . . . . . . . . . 60

*Uniform Guidelines On Employee Selection Procedures*,
29 C.F.R. §1607.4D . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## I.    STATEMENT OF JURISDICTION

Jurisdiction rests on this Court's order granting permission to appeal.

## II.    STATEMENT OF ISSUES

1.    Was it error or an abuse of discretion for the district court not to follow this Circuit's mandate holding that sufficient statistical and non-statistical evidence has been presented to certify a pattern-or-practice and disparate impact class covering all six production departments of the defendants' manufacturing plant in Huger, South Carolina?

## III.    STATEMENT OF CASE

The plaintiffs are the same African-American employees at defendants' steel fabrication plant in Huger, South Carolina who were before this Court four years ago in *Brown v. Nucor Corp.*, 576 F.3d 149 (4th Cir. 2009), *cert. denied* 130 S. Ct. 1720 (2010).  Plaintiffs adopt the procedural history of the case described in the Court's decision. The Court's mandate held that plaintiffs presented sufficient evidence to certify a class pattern-or-practice claim with two inter-related components — racially stratified promotion opportunities and a racially hostile work environment. *Id.*  The decision was based on two primary holdings. First, the Court held that "the district court improperly excluded the appellants' alternative benchmark for missing employment data and therefore erred in finding their statistical calculations to be

1

insufficient to establish commonality." *Brown*, 576 F.3d at 153. The mandate explained that "the district court abused its discretion when it excluded the appellants' alternative calculations of the destroyed pre-2001 promotions data" and that "[w]ith this data included, the appellants' statistics were independently sufficient to meet the Rule 23 commonality requirement." *Id.* at 157.

Second, the Court held that plaintiffs "presented compelling direct evidence of discrimination, such as denials of promotions when more junior white employees were granted promotions, denial of the ability to cross-train during regular shifts like their white counterparts, and a statement by a white supervisor that he would never promote a black employee. This evidence alone establishes common claims of discrimination worthy of class certification." *Id.* at 153–154 (record citations omitted).

Based on such statistical and non-statistical evidence, the Court issued a mandate that "the class certification requirements of Rule 23(a) have been satisfied with regard to the appellants' disparate impact, disparate treatment, and hostile work environment claims." *Brown*, 576 F.3d at 160. Consistent with the Supreme Court's subsequent decision in *Amgen, Inc. v. Connecticut Retirement Plans & Trust Funds*, 133 S. Ct. 1184, 1191, 1194-1195 (2013), the Court determined that the relevant question is "not whether the appellants have definitively proven disparate treatment

2

and a disparate impact; rather, the question was whether the basis of appellants' discrimination claims was sufficient to support class certification." *Brown*, 576 F.3d at 156 (citing *Lilly v. Harris-Teeter Supermarket*, 720 F2d 326, 332 (4th Cir. 1983)).

Nucor submitted no new evidence on remand. The district court initially certified both the promotion and hostile environment components of plaintiffs' pattern-or-practice claim. JA9678-9707. It decided subsequently, however, to rescind class certification of the promotion aspect of such pattern-or-practice based on new findings that: (1) the statistical evidence found sufficient in this Court's mandate was not "reliable" for the reasons stated in the dissent to that mandate (JA10941-10960); and (2) the remainder of the evidence that this Court found sufficient was flawed because it was primarily concentrated in the Beam Mill. JA10949-10953. Both grounds were taken directly from the dissent to the Court's mandate. *See Brown*, 576 F.3d at 167-169 (Agee, J. dissenting).

## IV.    STATEMENT OF FACTS

### A.    Size And Organization Of The Berkeley Plant

Nucor Steel Berkeley is a small plant with six Department Managers who report to the plant's General Manager, Ladd Hall. JA8538-8560,1126-1127. The plant was constructed and went into operation approximately 20 years ago. JA5054-5055 (Moore). More than ten of those years have been consumed by this litigation.

3

African-Americans were only able to be hired through local political efforts when the plant first opened and have been unable to advance since then. JA8539,993-1125,8538-8560,1154-1171. The record showed 611 employees, of whom 71 (11.6%) were African-American. JA8539.

### B. The Statistics Demonstrating Plantwide Racial Disparities In Promotion Did Not Change On Remand

This Court determined that the statistical evidence of racial disparities in promotions is "independently sufficient to meet the Rule 23 commonality requirement." *Brown*, 576 F.3d at 157.

> With the 1999-2000 data included, the record indicates that the appellants' statistics would be significant at greater than two standard deviations. The appellants have therefore presented valid statistical evidence that independently indicates a disparate impact and disparate treatment in job promotions at Nucor . . . . We therefore find that the appellants' calculations based on their alternative benchmark were adequate to establish commonality.

*Id.* at 156.

 Nothing about those statistics changed on remand. No new statistical or other evidence was presented. The only thing that changed on remand was the district court's adoption of the dissent to the Court's mandate which questioned whether nine specifically identified Change-of-Status records were promotions. JA10941-10943. The nine Change-of-Status records  listed by Judge Houck from the dissent were

"JA8397-99, 8406-07, 8416, 8673-74, 8701,10941-10942." None of them were part of the 27 promotions included in the statistical evidence relied upon in this Court's mandate. *Compare id.* and *Brown*, 576 at 167-168 *with* Exhibit 2 to Dr. Fox's deposition ( JA1279; *see also* JA10998).

The nine Change-of-Status records adopted from the dissenting opinion involve just four persons – Tillman, Kolesar, DeFilippo and Cecil — **none** of whom were one of the persons promoted to the 27 jobs at issue. *Id.* Dr. Fox listed the 27 vacancies she relied upon in Exhibit 2 to her deposition on November 13, 2006 and discussed them at length in her testimony. JA1403,1403,1408,1409,1410,1411,1416-1419,1435,1475-1476; JA10976; JA10998. A comparison of the Change-of-Status records listed in the dissent and decision below with the 27 promotions listed in Exhibit 2 to Dr. Fox's deposition shows that they involve completely different people, events and records than those included in the promotion statistics that this Court found "independently sufficient to meet the Rule 23 commonality standard. *Brown*, 576 F.3d at 157. Nucor offered no contrary evidence and never argued that any of the 27 vacancies identified by Dr. Fox were not true promotional opportunities that were subject to its mandatory bidding procedure. JA10998.

Because the nine Change-of-Status records questioned by Judge Houck were not part of the statistical analysis, they did not reduce the statistical significance that

this Court determined to be sufficient for class certification. Black employees continued to be 19.24% of the persons who applied for promotion to the jobs Nucor deemed "similarly situated", but only 7.94% of the persons promoted to such jobs — a difference that is "statistically significant at -2.54 standard deviations from what would be expected if race were neutral in the selection process." JA1162; *Brown*, 576 F.3d at 156. Nucor's statistician, Dr. Welch, did not disagree with the statistical significance of the racial disparities in promotions for the 1999-2003 time period. The evidence also showed that black applicants for promotion to such jobs were selected only 36.2% as often as white applicants for the same job postings, far less than the 80% disparity necessary to establish disparate impact. JA1162; 29 C.F.R. §1607.4D The difference between black employees promoted to those jobs (7.9%) and their availability in the qualified workforce (38.2%) was shown to be -4.94 standard deviations, corresponding to greater than a 99% confidence level. JA1163-1164; JA1154, 1501-1513, 1213-1500. Plaintiffs' experts further showed that African-Americans comprised more than 38% of the industrial craft and operative employees in the surrounding workforce, but only 13% at Nucor — a difference of "more than -11.00 standard deviations . . . fewer . . . than one would expect." JA1158-1159.

Thus, the statistical evidence that this Court found "independently sufficient" to certify the class continues to establish a common pattern-or-practice for all six

production departments that Nucor included in the promotions it defined as "similarly situated" to one another.  The statistics were limited to 45 promotions across all six production departments that Nucor defined as "similarly situated" for purposes of class certification.   Nucor did not limit those "similarly situated" promotions to the Beam Mill. The district court found that the named plaintiffs "bid on promotions in four of the six production departments" and that there are at least "23 **similar** positions throughout the six production departments in addition to the jobs bid on by the plaintiffs." JA10928-10929,10937-10939 (emphasis added), JA475,477-478,486-488.  Both sides' statistical experts analyzed the statistical significance of racial disparities in the 70 promotions that Nucor defined as "similarly situated."

Nucor unilaterally defined promotions as "similarly situated" based on whether it thought that they were  "similar in pay, grade and experience required as the job the plaintiffs bid on." JA483-484.  Plaintiffs' statistician, however, demonstrated that not all such promotions were produced, that "[m]any of the positions and vacancies that have not been  produced are in the same job classifications and departments that the defendant has designated as 'similarly situated' to the named plaintiffs."  JA399, JA406-409,1161,1171.[1]

---

[1] Plaintiffs attempted to obtain production of all the promotions made by the Department Managers at issue through additional discovery and motions to compel that continued to be denied by the district court until shortly before the deadline for

## C.    The Evidence Was Sufficient Across All Six Production Departments

The district court questioned whether the non-statistical evidence was sufficient for departments other than the Beam Mill as its other ground for not following the appellate mandate. JA10950-10954. This Circuit rejected that contention in the first appeal, finding that there is "compelling direct evidence of discrimination, such as denials of promotions when more junior white employees were granted promotions, denial of the ability to cross-train during regular shifts like their white counterparts, and a statement by a white supervisor that he would never promote a black employee (JA1885-86)." *Brown*, 576 F.2d at 153 (citations omitted).

The evidence supports the Court's mandate that the same pattern-or-practice of promotion discrimination extends throughout all of the production departments, not just the Beam Mill.  Nucor produced 45 promotions that it defined as "similarly situated" across the six production departments.  JA7203-7853.  The bid records for those 45 similarly situated promotions include at least 70 bids by black employees. JA7203-7853.    Those promotions to "similarly situated" jobs were spread proportionately across the Hot Mill, Cold Mill, Melting and Beam Mill, including at least 14 African-American bidders denied promotions in ten jobs in the Hot Mill; at

---

submitting the evidence in support of class certification.  JA399-400, 408,409,1161,1171,9059-9060,9066-9075 JA89,233,397,453,489,557,589,785,853.

least 14 African-American bidders denied promotions in eleven job classifications in the Cold Mill; at least 12 African-American bidders denied promotions in nine jobs in Melting; and at least 22 African-American bidders denied promotions in fourteen jobs in the Beam Mill.  JA7203-7853.

Plaintiffs submitted testimony from 16 class members from the 70 or so black employees working in the six production departments at any one time. Those sixteen witnesses described more than 15 instances of promotion discrimination in the non-Beam Mill departments. They included the following witnesses who worked in or were denied promotions to non-Beam Mill jobs:

**Hot Mill:**
Alvin Simmons (JA1021-1022, 1024; JA7624; JA2900:19-2904:2)
Sheldon Singletary (JA1049,1055-1054)
Byron Turner (JA1122,7499)
Jerry Nick (JA1091-1092; JA7411,7619,7625,7654)
Ray Roane (JA7237)

**Cold Mill:**
Jason Guy (JA1061-1063)
Bernard Beaufort (JA1118-1119)
Robyn Spann (JA1103)
John Singletary (JA5661)

**Melting:**
Jacob Ravenell (JA1029-1037,7645,7659)
Alvin Simmons (JA1024, ¶12; JA2953:8-14,2958:12-2959:10; JA7334,7535)
Jason Guy (JA1061,1064)
Aaron Butts (JA1085-1086)
Eric Conyers (JA1097-1080)

9

Earl Ravenell (JA1110-1111)
Quinton Brown (JA1009)

**Shipping:**
Bernard Beaufort (JA1118-1119)

**Supervisor Promotions involving the plant's General Manager:**
Ray Roane (JA996, ¶8)
Gerald White (JA1041, ¶8)
Sheldon Singletary (JA1051, ¶8)
Quinton Brown (JA1010, ¶7)
Aaron Butts (JA996, ¶8)
Ken Hubbard (JA1097, ¶5)

### 1.    Ample Non-Beam Mill Anecdotal Evidence Was Before The Court In The First Appeal

Sheldon Singletary had extensive experience in the Hot Mill but "when he

applied for promotion to Mill Tech the job was given to a white employee.  JA1049,

¶¶3-4; JA3969:3-3971:23. "The persons making the decision all were white.  There

were no black supervisors or managers in the Hot Mill Department at the time of my

bid or during my employment generally." JA1049, ¶4; JA3736.

> 6.      * * *  I bid [for Mill Tech] because I met the posted
> qualifications for this job and wanted the opportunity to have more
> responsibility and improve my position.  The job, however, was given
> to a white employee, Ray Bilbrough.  I did not believe that Bilbrough
> was qualified for that position.  After Bilbrough was selected for the job,
> I reported to my supervisor, Bill Seres, that I felt I was denied this
> position  because  of  my  race.  Seres told me that he supported
> Billbrough. * * * Seres' comment . . . told me that Seres would support
> an unqualified white candidate over me, a qualified black candidate, . .
> . . * * *  I had to come in on my days off to train to be a Mill Tech,

whereas Bilbrough and others who were training for mill tech were allowed to train during their shift. I complained to Bill Seres about not being allowed to train during my shift, but nothing was done to give me the same chance to train as was given to white employees. I also complained to Thad Solomon, my department manager, about not being allowed to train during my shift. Solomon brushed my concerns off and gave me no definite answer.

JA1050-l051,¶6(Singletary);JA3969:3-3971:23,3972:8-3972:13,3973:23-3975:21,3976:5-3976:13. Bilbrough prominently displayed tattoo of the Confederate flag in the plant and on his license plate on his car. JA1054, ¶14. While "sitting in his truck with a pistol in each hand" and a Nucor supervisor close by, Bilbrough told Singletary and another class member, Byron Turner, that he "ought to shoot our asses." JA1054, ¶14; JA3919:5-3923:20.

Singletary complained to the Hot Mill Department Manager, Thad Solomon, about the "unfair treatment I was getting on my crew when I was not allowed to cross train for mill tech during my shift while white employees were able to cross train during their shift and that I wanted to change crews" but Solomon did not address or resolve the problem." JA1055-1056, ¶16. Solomon displayed the Confederate flag on his hard hat as Department Manager of the Hot Mill. JA1054, ¶14; JA3948:20-3949:23. The same racially hostile work environment was experienced in the Hot Mill as was found in the Beam Mill. JA1053-1055. Guy also reported to Solomon that another class member in the Hot Mill, Lamont Yeadon, was passed over for a

11

promotion to Furnace Tech for a person in favor of a white employee who had only been employed for six months." JA1056, ¶16; JA3962:4-22 (Singletary). Again, "Solomon did nothing about my complaints." JA1055-1056, ¶16.

Alvin Simmons "applied for job postings in . . . other departments, but white employees were given all the jobs I bid on in those areas and departments." JA1021, ¶5. He applied "for eight different jobs in three different departments, the Beam Mill, the Melt Shop and the Hot Mill." JA1021-1022,¶6;JA2829-2830:12,7322,7334,7674,7576,7535,7565,7611,7689,7786. He twice bid on Strandtender in Melting, "met the posted qualifications . . . on both occasions." He "was not interviewed." JA1024,¶12; JA2953:8-14,2958:12-2959:10. A less qualified white employee, Randy Tisdale, was selected instead. JA1024, ¶12. Another white employee, Bryan Daniels, was selected for the second Strandtender promotion that Simmons applied for; Daniels had only been employed one year and had less experience than Simmons. JA1024, ¶13. In the Hot Mill, Simmons bid on Coiler Technician, met the posted job requirements, but was never interviewed. JA10245, ¶14; JA2900:19-2904:2. Instead, Nucor promoted a white employee, Wayne Spreitzer, even though he had been disciplined less than a year earlier for "not paying attention" when operating equipment. JA1024, ¶14; JA8788-8789.

Jason Guy worked in both the Cold Mill and Beam Mill and applied for

12

promotions in both those departments and Melting. JA1061,¶5; JA7251,7398,7307,7546,7570,7526,7495,7473,7613,7578. He applied and was qualified for Furnace Recorder and Ladle Wall Helper in Melting, Reversing Mill Utility #2 in Cold Mill and Crane Operator in Shipping. JA1061, ¶5; JA5512:12-5514:19,5515:5-24. Guy bid on the Cold Mill promotion because he "wanted to leave the beam mill where I was not making any progress in getting promoted" and "wanted to return to the reversing mill where I had worked before." JA1063,¶4. He was not promoted, however, when his Beam Mill Department Manager, Paul Ferguson, "would not sign my transfer form" for the promotion Guy sought in the Cold Mill. JA1063, ¶11; JA5504:4-19,5506:5-5507:25. Guy also bid and was qualified for Ladle Wall Helper in Melting, but a white employee was selected and Guy "was not interviewed." JA1064, ¶12; JA5536:8-13. He testified that his supervisors in the Beam Mill, "would not have anything good to say about me because of their hostility towards African Americans." JA1064, ¶12; JA5515:15-24,5538:18-5539:7. Guy applied for Crane Operator in Shipping Department, but was never interviewed or selected. JA1064, ¶13; JA5537:17-5538:6. Guy complained to his Department Manager, Paul Ferguson, he "was the most qualified and was denied the position because of my race." JA1062, ¶6. He also told Ferguson that "since I had been at the plant, people behind me moved up after I trained them,

13

and I am still in the same place." JA1062, ¶6. Ferguson "wasn't receptive to my comments." JA1062, ¶6; JA5498:24-5499:19.

Jerry Nick worked in the Hot Mill where he was bypassed by a less qualified Caucasian employee, Jamie Poston, on a promotion to Furnace Conveyor Technician that was not disclosed to Nick. JA1091, ¶4; JA7411,7619,7625,7654; JA4896:2-23. He also bid and was qualified for that job on four other occasions that less qualified Caucasians were promoted over him. JA1091, ¶¶5-9; JA7619,7625,7654,7411. "My supervisor told me that I did the best on the test", but "[d]espite my performance on the test and prior cross-training as a Furnace Conveyor Technician, I was not selected." JA1091-1092, ¶¶7-9; JA4899:4-5. "It seemed as though every time I applied the criteria for the job changed. For example, I was told that performance on the test was most important, but had the best test score since it suddenly  wasn't an important factor in the decision making.  I eventually became a Furnace Conveyor technician but only after this lawsuit was filed." JA1092, ¶10.

Bernard Beaufort worked in the Cold Mill and in Shipping where he bid on "Shipping Supervisor." JA1118, ¶9: JA4542:1-7. There were "no black supervisors in the . . . Shipping Department" and his supervisor Mike Gwynn, told him "there was no need for me to apply." JA1119, ¶9; JA4542:8-25,4543:16-4544:15. Consequently, Beaufort was "never interviewed." JA1118-1119, ¶9; *id.*  A white employee, Phillip

14

Clark, was given the promotion notwithstanding the fact that Beaufort had trained Clark. JA1119, ¶9; JA4544:12-25.. Beaufort objected, but was never given a reason for Clark bypassing him. *Id.* Nor was he given the opportunity to cross train. JA118, ¶7; JA4520:2-4522:23. "When I asked if I could train for other positions, my supervisor and manager would not give their okay." JA1118, ¶7.

Aaron Butts worked in Melting and the Beam Mill, applying for promotion in both departments. JA1085, ¶¶2-5; JA1085-1086. He applied and was qualified for Second Helper in Melting: "Despite the fact that I had cross trained on my days off for this job, two white employees were promoted over me." JA1085, ¶2. He also applied, was qualified and not promoted to Ladle Crane Operator in Melting: "I had cross trained on my days off for the job and was well qualified based on the posted qualifications, but once again I was not selected and two white employees were promoted instead." JA1085, ¶3; JA4345:19-4347:5.

Eric Conyers worked in Melting and the Beam Mill. JA1079, ¶¶3-5; JA4067:21-23. He applied and was qualified for Ladle Crane Operator in Melting, but was told by the supervisor, Tony Gurley, that he "never got" Conyers' application. JA1079-1080, ¶¶5-6. Conyers' supervisor in the Beam Mill, Paul Nowlin, blocked his application to Melting. JA1080, ¶5; JA4072:3-4073:15. "I asked Nowlin to find someone to work my position so that I could cross train on other jobs.

15

He would never find any one to relieve me, therefore, I could never leave my job to cross train.  I observed him helping white employees get cross training."  JA1080, ¶5.

Earl Ravenell worked in Melting.  JA4790:22-4791:23.  He applied and was qualified and not interviewed or selected for promotion to Leadman in Melting.  JA1110-1111, ¶3; JA4759:23-4765:23, 4766:17-4767:10.  He was also interested and qualified for supervisory positions in both the Hot Mill and Cold Mill, but his supervisor in Melting, Darin Reynolds, "would not give me a good recommendation."  JA1111, ¶4; JA4749:3-21.  Ravenell told the Plant Manager, Ladd Hall, three times "about the discriminatory treatment I and other African-American employees were receiving" in Melting, but Hall "did nothing to change the situation."  JA1112, ¶5; JA4795:17-4798:24, 4799:8-4780:15.

Robyn Spann worked in the Administration Department and the Beam Mill and was denied promotion in the Cold Mill and Beam Mill. JA1103, ¶3; JA4202:8-4204:14 JA7430, 7464.  The Cold Mill rejected her application for an entry-level position despite the fact she met the posted qualifications. JA1103, ¶3; JA4206:2-21.  Byron Turner worked in the Hot Mill and applied for the promotion to Coiler Technician given to a white employee.  JA1122, 7499.

Class members further testified that they "have not been afforded the same opportunities as white employees to cross-train during [their] shift to gain experience

on other jobs. JA999-1000, ¶17; JA1011, ¶10, JA1023, ¶10, JA1063, ¶10; JA2401-2405:7; JA2908:4-11. Class members testified that "[l]arge areas of the plant were basically segregated by race" and it was "well known that there were certain areas of the plant where a black person would not be allowed to work." JA1026,2898-2900,2937-2938; JA5121 (Hubbard).

### 2. The Plant's General Manager Was Heavily Involved In A Series Of Promotions To Supervisory Jobs Sought By Black Employees

The six production departments shared a common General Manager, Ladd Hall, who became involved in a series of incidents of racial discrimination in supervisory promotions that he was asked to handle including the supervisor promotions denied plaintiffs Roane, White, Butts and Brown. JA996,998,1002-1003,1015-1016,1056,1071,1087,1104,1112-1123;JA1922-1931,1941-1942,1953,2028-2033,2225-2229,2258-2260,2376-2379,4214,4216,4456-4459,5498-5499;JA1922:7-1931:9,1941:3-1942:5,1953:18-25.

This Court noted that "[t]here were no black supervisors until after the institution of the [EEOC] charged that preceded this litigation." *Brown*, 576 F.3d at 151; *see also* JA998, ¶11; JA1021, ¶5. Ray Roane applied for Roll Mill Supervisor in late 1999 and 2000 and "was the best qualified candidate based on the posted qualifications." JA996, ¶8; JA1928-1932,7377. When Roane applied, however, the

17

posting was "suddenly canceled." JA996, ¶8.  Paul Ferguson, the department manager, stated "You know, that black bastard will never move up as long as I'm manager."  JA996, ¶8; JA1066,1885-1886; JA2040:1-6.  A white employee, Gary Henderson, was given the position. *Id.*  When Roane subsequently applied for a second vacancy for Roll Mill Supervisor, the department manager told him he would not be considered because his application "had been misplaced."  JA996, ¶8; JA1927:1931:13. Aaron Butts' application for finishing mill supervisor similarly was "misplaced" around the same time.  *Id.*; JA1943:20-1945:7.  Roane told the plant manager, Ladd Hall, that his application had been "misplaced" to avoid appointment of the first black supervisor in the plant, but Hall did nothing about it. JA996, ¶8. Roane also reiterated to his Department Manager that " my qualifications were excellent and far superior to Henderson's, that as a CP-1 operator I had consistently received high evaluations, that my supervisors relied on me to fix problems in the mill without their supervision, and that  my engineering technology degree with training in quality control, electrical controls, computers, hydraulics and pneumatics made me a better candidate than Henderson." JA998, ¶12.

Ray Roane was not the only class member denied promotions to supervisory positions. Gerald White testified that he applied for the Supervisor posting in the Roll Shop that was given to a white employee from another department, Jerry Herrman.

18

JA1041, ¶8; JA7283,3332:18-3336:5. White had extensive training and experience for this job, while Herman had none. JA1038-1039, ¶¶3-4, 8. "It was widely known that Hermann had poor leadership skills and had been demoted from a previous position at Nucor because he couldn't get along with his co-workers." JA1041, ¶8. White was also denied the Leadman job in the Roll Shop that was given to an employee who had no leadership experience except at a pizza restaurant . JA1040-1041, ¶7; JA1022, ¶7; JA3373:12-15,3380:5-22 ("As long as I have been employed at Nucor Berkeley there have never been any black Mill Adjusters and only one black Mill Inspectors.  The Mill Adjusters are Leadmen positions and are some of the higher pay grade positions in the Beam Mill or the plant."); JA7454,3383:2-20,3385:4-14.

Sheldon Singletary's prior education and experience "made me interested in supervisory jobs which were not posted and which were usually filled before I knew about the chance to say I was interested" because they were "handpicked in a secret manner." JA1051, ¶8; JA3983:25-4003:21. "White employees had brothers, uncles and cousins in key positions at the plant; therefore, white employees were able to move through the ranks quickly and to much higher jobs than black employees." JA1053, ¶12. Singletary's brother, John Singletary, was a graduate of the Citadel, but was unable to move into higher paying or supervisory positions despite his

19

credentials.  JA1053, ¶12; JA3739:8-3740:13. Another black graduate of the Citadel, Hillary Douglas, worked on the Pickle Line in the Hot Mill and was also unable to advance to supervisor or manager at Nucor. JA1053, ¶12; JA3741:10-3743:2.

Ken Hubbard sought supervisory positions for which he was well qualified but he was put in the position of Production Coordinator "to get me out of Mill and line of progression that lead to supervisory positions."  JA1097, ¶5; JA5056:22-5058:2. Quinton Brown also testified that he was qualified for supervisory jobs "which were not posted and which were usually filled before I knew about [them]" because white employees "were handpicked in a secret manner." JA1010, ¶7; JA2477:10-2478:11,2486:16-2488:14.  This Court has already held that "other black employees should be counted in the class because 'potential applicants are eligible to prove that they would have applied for a promotion but for the discriminatory practice.'" *Brown*, 576 F.3d at 152.

Ray Roane told the plant's General Manager, Ladd Hall about such racial discrimination in plant promotions in April 2001, including "misplacing" his application for Roll Mill Supervisor. JA996, ¶¶8-9. "Hall told me that he didn't want to hear about complaints of race discrimination." JA997, ¶9.  Roane then sent  Hall an e-mail on August 2, 2001 that told him of other black employees who were experiencing similar racial discrimination in promotions.  JA997, ¶9; JA5775. This

20

time, Hall "did nothing about what [I] told him except to threaten me." JA997, ¶9.

Rather than looking into the discrimination in promotions reported to him, Hall threatened Roane with loss of his job, "asking [me] how much money [I] made last year with the implicit threat [I] could not afford to lose my job." JA997, ¶9; JA2258:1-2260:18. Rather than doing something about such discrimination, Hall also told Roane that "there would be serious repercussions if what was being reported about discrimination turns out not to be true." JA997, ¶9; *Id.* Roane also reported the "racial hostility . . . black employees were experiencing to . . . Ladd Hall." JA1002, ¶25.

Roane also reported to management that "promotions were racially unfair", that "there wasn't any test of a person's knowledge, that Nucor was "promoting people without testing their knowledge or qualifications for the job", and that "it's difficult for an African American to move up in the plant in the present environment." JA997, ¶10; JA2225:13-2229:11. Roane further reported that the promotion process was so unstructured that "this allowed racial bias to affect who was chosen."

> I have never been tested either oral or written on my knowledge of the process, yet denied promotions every time. When I asked what do I need to do, it is never anything that could be defined, or anything that is documented.

*Roane Decl.* at ¶ 26 (JA1002-1003). When Roane was subsequently denied

promotion to Mill Adjustor that was given to a white employee, Matt Blitch, he asked his Department Manager, Paul Ferguson, if he "could put the reasons I was not selected in writing so that I would know what to work on." JA998, ¶13; JA2028:18-2031:6. Ferguson told him he "would have to speak with Ladd Hall, the plant manager. JA998, ¶13. Roane then asked Ladd Hall "about the reasons I did not get the job" but was told that no reason would be given. JA998, ¶13.

Both Roane and Gerald White reported to Hall that black employees "could not get promoted at Nucor-Berkeley" because "there was a 'glass ceiling' . . . and that they couldn't get a fair shot." JA997, ¶10; JA2232:8-2233:25 (White); JA3735 (Singletary). Other class members also reported racial discrimination in promotions to Hall as plant manager. JA1015-1016, ¶9. Quinton Brown reported to Hall "about the promotion problems I was having", but "nothing was ever done to correct the situations I told him about." JA1016, ¶26; JA2376:20-2377:21,2378:17-2379:23. Shelton Singletary told Ladd Hall about the racial hostility in the Hot Mill, but Hall did not respond to my concerns. JA1056, ¶17. Jason Guy "complained to Paul Ferguson and Ladd Hall about [his] treatment, but nothing was done." JA1071, ¶29; JA5498:24-5499:9. Byron Turner "complained to Ladd Hall, the plant manager, about the racially discriminatory comments and material that [he] encountered at Nucor." JA1123, ¶5.

22

> I complained to Ladd Hall about the racial discrimination I was encountering at Nucor on perhaps four different occasions. Hall asked me if I thought there was racism at Nucor, and I told him, "Yes," that I thought there was. When I suggested that Nucor initiate training regarding racial issues and designate some people who have training in equal opportunity and racial issues to whom Nucor employees can consult about racial issues that arise, my impression was that this could not be done because it may offend the white employees.

JA1124, ¶5 (Turner). Earl Ravenell reported the racial discrimination against him and black employees in Melting to Ladd Hall on three different occasions, but nothing changed. JA1112, ¶5. Robyn Spann also took her rejection for promotion to Ladd Hall, "but nothing ever happened." JA1104, ¶4; JA4214:2-4216:9. Aaron Butts testified that he "met with plant manager, Ladd Hall, and Controller, Brian Kurtz" about race discrimination in promotions." JA1087, ¶8; JA4456:11-4459:19. "During the meeting, Mr. Hall said to me, 'I heard there was some race discrimination going on. Have you heard anything about this?' I said, 'Yes, there is race discrimination being displayed,' and described to him the problems that black persons like myself were having in getting promotions. Nothing ever changed, however." JA1087, ¶8.

### 3. The Court Found A Common Promotion Procedure Was Used Throughout The Plant

Plaintiffs submitted substantial evidence showing that the pattern-or-practice of racial discrimination and hostility exists plant-wide. Pl. Exhs. 1-16, 29-31, 52-53,

JA993-1124,1807-1898,8537-8560.  A centralized plant-wide posting and bidding procedure is controlled by a central personnel department at the plant. JA8147-8148,8817-8818.  Employees are allowed to bid for promotions in any of the six departments, not just their own.  JA1785,1790,8977-8978,9102.  Nucor's written Policy on promotions states promotion applications are "accepted only by the Personnel Department" and are  required to be submitted "to the Personnel Office." JA257-259. Promotion decisions were made by just six Department Managers and the plant's  General  Manager.  JA1719-1796.  An expert in industrial hiring and promotion procedures testified that "the selection procedure for hiring and promotion have these same basic features throughout the Company regardless of department." JA1157,1515-1516,1520.  The district court found that Nucor has a "*plantwide* promotion  procedure"  and  that  there  was  "evidence probative of a   *plant-wide* employment  practice  *discriminating*  against  African-American employees." JA9099,9102,9104-9103 (emphasis added).

The plant's General Manager must approve and sign all Change of Status forms that effectuate promotions. JA477-478.  The district court found that to promote someone "the supervisor, the department manager, *and the general manager* must approve a written change of status and then submit the change of status form to the personnel office." JA477-478 (emphasis added).

24

The General Manager is also involved in promotions from one department to another, as required by plant Rule 6 which states: "A written Change of Status must be approved by the General Manager and submitted to the Personnel Office one week prior to change." PX2, ¶6 (JA259-260). The promotion Policy then states in bold letters "**Any Exceptions** to this policy must be approved by the General Manager." PX2 (JA260).

The plant's General Manager admitted that it was his responsibility to investigate and respond to racial harassment or discrimination." Pl. Exh. 17 (doc. no. 185-18); JA1126-1127, Nucor's written Policy on investigating concerns about racial harassment states in bold italics that "*you should report such matters to: Personnel Supervisor or General Manager*." Pl. Exh. 75, Nucor Employee Handbook at p. B-4 (emphasis in original)(doc. nos. 213-37 to 213-38). Hall never involved the department managers in such process. Not even one of the five department managers has been shown to have lifted a finger to redress the racially hostile work environment found to exist both plant-wide and in each department.

### 4. The Racial Bias In Promotions Found In The Beam Mill Adversely Affected Promotion Opportunities Throughout All Six Production Departments

The district court found that "[w]ithout question, the plaintiffs have presented evidence of a serious pattern of racial discrimination regarding promotions in the

25

Beam Mill, and their evidence would almost certainly satisfy <u>Wal-Mart's</u> demand for "significant proof" of a general policy of discrimination in that particular department." JA10953. The evidence showed, however, that the racial bias of Beam Mill managers and supervisors migrated beyond that department and directly affected promotion opportunities of African-Americans in other departments who wanted to promote into the Beam Mill, and as well as the promotional Beam Mill employees who needed their own supervisor's and manager's recommendation and signature to be considered for promotions in other departments. Nucor's written policy required promotion candidates to have their supervisor's recommendation and signature. JA8817; JA788;JA811-813; JA7911.

Nucor's Policy is explicit in stating that employees' own Managers are directly involved in selection decisions for promotion to other departments, stating in Rule #3 that "Management shall attach considerable weight to the opinions and recommendations of the supervisors to whom the employee reports."JA259, ¶3. Nucor also has a written policy on promotions which states: "The promotion of an employee must be approved in writing by the supervisor he/she reports to and the supervisor at the next higher level." JA257. On November 1, 2002 this requirement was made even more stringent by adding an "Application for Transfer *must* be signed by your supervisor and Manager." JA259. The Policy also requires that "[t]he

application *must* be submitted with [such] signatures prior to the deadline date written on the posting." JA259.

### D.    A Pattern Of Racial Hostility Was Found To Extend Throughout All Six Promotion Departments

The evidence also established that department managers and supervisors and plant General Managers fostered a racially hostile work environment throughout the plant. JA993-1071. The district court found on remand that a pattern of racial hostility extended throughout the plant and was not limited to the Beam Mill.  JA10966 (Finding "a substantial pattern of racial harassment by their supervisors and coworkers in the Beam Mill" and that "most of the declarations of non-Beam Mill employees submitted by the plaintiffs allege significant instances of racist behavior by coworkers.").  This Court's mandate held that there is "sufficient evidence to indicate that all of the black employees were affected by the comments and actions of the white employees and *supervisors in other departments*." *Brown*, 576 F.3d at 158 (emphasis added).   The Court determined "there is scant, if any, evidence that each of the departments is so autonomous as to justify classifying them as separate environments" and that "it was an abuse of discretion for the district court to find that the employees at the plant were separated into different environments." *Brown*, 576 F.3d at 157-158.  The Court also specifically determined that:

27

> . . . **white supervisors** and employees **frequently** referred to black employees as "nigger," "bologna lips," "yard ape," and "porch monkey." White employees **frequently** referred to the black employees as "DAN," which stood for "dumb ass nigger." These racial epithets were broadcast over the plant-wide radio system, along with "Dixie" and "High Cotton." Monkey noises were also broadcast over the radio system in response to the communications of black employees. The display of the Confederate flag was **pervasive throughout the plant**, and items containing Nucor's logo alongside the Confederate flag were **sold in the plant's gift shop**. Additionally, several e-mails that depicted black people in racially offensive ways, such as by showing them with nooses around their necks, were circulated by various employees. Once, an employee held up a noose and told a black co-worker that it was for him.

*Brown*, 576 F.3d at 151 (emphasis added). The district court also found that "plaintiffs have presented plant-wide racist acts potentially experienced by every African-American employee working at the plant." JA8988-8994. The district court found on remand that Nucor's "production departments were permeable, if not unitary", and that this finding is "buttressed by the fact that Nucor's bidding is plant-wide." JA9705. "It follows then, that there are common issues of law and fact with regard to the members of the proposed class." JA9705. This was no less true for promotions as for the term and conditions aspect of the overarching pattern-or-practice.

## V.   SUMMARY OF ARGUMENT

The district court erred as a matter of law by declining to follow this Court's mandate that held there is sufficient statistical and non-statistical evidence to certify

a class covering all six production departments.  Judge Houck had no authority to enter new findings contrary to that mandate.  Those new findings are also contrary to the evidence.

## VI.    STANDARD OF REVIEW

Decisions not to follow an appellate mandate are reviewed *de novo* as a matter of law.  "An error of law constitutes an abuse of discretion."  *A Helping Hand LLC v. Baltimore County, Maryland*, 515 F.3d 356, 370 (4th Cir. 2008).

## ARGUMENT

## I.    DISCUSSION OF ISSUES

### A.    The District Court's Rejection Of The Appellate Mandate And Adoption Of The Dissenting Opinion Does Not Come Within The "Rare" And "Extraordinary" Exceptions To The Mandate Rule

The district court erred as a matter of law by following the dissent to this Court's mandate rather than the mandate itself.  The mandate held that plaintiffs presented sufficient evidence to certify class claims of a pattern-or-practice of racial discrimination with two inter-related components — racially stratified promotion opportunities and a racially hostile work environment. *Brown*, 576 F.3d at 160.  The decision was based on two primary holdings. First, the Court held that "the district court improperly excluded the appellants' alternative benchmark for missing employment data and therefore erred in finding their statistical calculations to be

29

insufficient to establish commonality." *Id.* at 153. The mandate explained that "the district court abused its discretion when it excluded the appellants' alternative calculations of the destroyed pre-2001 promotions data" so that "[w]ith this data included, the appellants' statistics were independently sufficient to meet the Rule 23 commonality requirement." *Id.* at 153, 157.

Second, the Court held that plaintiffs "presented compelling direct evidence of discrimination, such as denials of promotions when more junior white employees were granted promotions, denial of the ability to cross-train during regular shifts like their white counterparts, and a statement by a white supervisor that he would never promote a black employee. This evidence alone establishes common claims of discrimination worthy of class certification." *Brown*, 576 F.3d at 153 (record citations omitted).

The district court, however, erred as a matter of law in deciding not to follow this Court's mandate by entering contrary findings that: (1) the statistical evidence found sufficient in this Court's mandate was not "reliable" for the reasons stated in the dissent to that mandate (JA10939-10945); and (2) the remainder of the evidence that this Court found sufficient was flawed because it was primarily concentrated in the Beam Mill. JA10952-10953. Both grounds for not following the mandate were erroneous as a matter of law and fact.

30

The district court's stated reason for rejecting the same statistical evidence that this Court held to be sufficient for class certification was as follows: "This Court shares Judge Agee's view of the plaintiffs' statistical analysis, and his opinion dissenting in part and concurring in part thoroughly expresses this Court's concerns." JA10941. The dissent adopted by the district court questioned whether nine specifically identified Change-of-Status records were really promotions. It is undisputed, however, that those nine Change-of-Status forms were not part of the statistics or the 27 Change-of-Status records that this Court held to be "independently sufficient to meet the Rule 23 commonality requirements." *Brown*, 576 F.3d at 157; *see* pp. 4-7 *supra* (explaining record evidence).

On the non-statistical evidence, this Court specifically rejected the dissent contention that the evidence is primarily limited to the Beam Mill. *See Brown*, 576 F.3d at 165 (Agee, J. dissenting). Once this Court decided against the dissent on this point, the district court was not free to adopt the dissent's finding that there was insufficient evidence of a pattern-or-practice in departments other than the Beam Mill. The Court's ruling that the evidence was sufficient to certify a plantwide pattern-or-practice class was final under the mandate rule. The district court's new finding on remand that the evidence is primarily limited to the Beam Mill is also contrary to the evidence, as shown at pages 8-28 *supra* and pages 43-49 *infra*.

31

This Court has held that "[f]ew precepts are as firmly established as the doctrine that the mandate of a higher court is 'controlling as to matters within its compass.'" *U.S. v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993) (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939). Finality and respect for the appellate process are the core purposes of the mandate rule. *Walker v. Kelly*, 589 F.3d 127, 137 (4th Cir. 2009). The rule is absolute in order to "promote judicial economy and finality" and "foreclose relitigation of issues expressly or implicitly decided by the appellate court." *Id.*; *see also Bell*, 5 F.3d at 66. The Supreme Court has emphasized that adherence to the mandate rule promotes finality by "protecting against the agitation of settled issues" that "threaten to send litigants into a vicious circle of litigation." *Christianson v. Colt Industries Op. Group*, 486 U.S. 800, 816 (1988) Put simply, there is a compelling "need for litigation to finally come to an end." *U. S. v. Williams*, 162 Fed. Appx. 254, 259 (4th Cir. 2006). The mandate rule "'provides stability and finality in litigation, which are crucial cornerstone values for developing a just and efficient judicial process." *Id.* (quoting *Klay v. All Defendants*, 389 F.3d 1191, 1199 (11th Cir. 2004). "'Repetitive hearings, followed by additional appeals, waste judicial resources and place additional burdens on . . . hardworking district and appellate judges.'". *Id.* (quoting *U. S. v. O'Dell*, 320 F.3d 674, 679 (6th Cir. 2003)).

"[I]t is indisputable that a lower court generally is 'bound to carry the mandate

of the upper court into execution and not consider the questions which the mandate

laid at rest.'" *Bell*, 5 F.3d at 66; *see also United States v. Pileggi*, 703 F.3d 675, 679

(4th Cir. 2013). The Court has emphasized that "this 'mandate rule' . . . **compels**

**compliance** on remand with the dictates of a superior court and forecloses relitigation

of issues expressly **or implicitly** decided by the appellate court." *Id.* (emphasis

added). "Thus, when this court remands for further proceedings, a district court **must**,

except in rare circumstances, 'implement both the **letter and spirit** of the . . .

mandate, taking into account our opinion and the circumstances it embraces.'" *Bell*,

5 F.3d at 66-67 (emphasis added); accord *Pileggi*, 703 F.3d at 679.

    The need to preclude relitigation of settled issues is particularly strong when

a mandate is issued under Rule 23(f). *See e.g. Gene & Gene LLC v. Biopay LLC*, 624

F.3d 698, 703-704 (5th Cir. 2010) ("The issue of class certification was expressly

decided by this court and 'that should be the end of the matter.'"). "We reversed . .

. not for a renewed foray into the same issue but for a merits determination and

disposition." *Gene*, 624 F.3d at 703-704. The whole purpose of interlocutory review

under Rule 23(f) is "to accelerate appellate review' . . . prior to final judgment in

order to 'permit  the parties to proceed in confidence about the scope and stakes of

the case thereafter.' *Id.*  at 704.

    This Court recognizes only three narrow and "extraordinary" exceptions to the

mandate rule, none of which apply here:

> (1) a "showing that controlling legal authority has changed dramatically; (2) significant new evidence, not earlier obtainable in the exercise of due diligence, has come to light; or . . . (3) that a blatant error in the prior decision will, if uncorrected, result in a serious injustice."

*Bell*, 5 F.3d at 67 (citing *Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir. 1988)); *Pileggi*,703 F.3d at 682.

The district court did not rely on the latter two grounds – that there was "new evidence" or a "blatant error" causing "serious injustice." *Bell*, 5 F.3d at 67. No new evidence was presented below. The district court based its decision on *exactly the same* evidentiary record that this Court thoroughly reviewed and debated. As shown in the next section, there also has been no change in law which opened the door to contrary findings and conclusions by the district court.

## B.    The District Court Erred By Requiring Plaintiffs To Show They Will Prevail On The Merits

The decision below is based on the mistaken supposition that the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) requires evidence that plaintiffs will *prevail* on the merits of their pattern-or-practice claim in order to   certify a class.   JA10934-10935,10940,10950.   Examples of such error appear throughout the opinion below. *See e.g.* JA10939-10944,10950 ("The standard for establishing commonality is so similar to the standard for establishing liability that

it is hard to imagine how a court could evaluate commonality without delving deeply into the merits of the plaintiffs' claims."); *id.* ("[A] trial court not only may, *but must* evaluate the merits of the plaintiffs' case to ensure that the plaintiffs have satisfied the commonality requirement."); *id.* at 10950 ("The commonality standard applied by the Fourth Circuit in *Brown* was less rigorous than the standard applied by the Wal-Mart Court.").

The Supreme Court rejected this identical misinterpretation of *Wal-Mart* in *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S.Ct. 1184, 1191, 1194-1195 (2013). The Court held that "Rule 23 grants no license to engage in free-ranging merits inquiries at the certification stage." *Id.* at 1191. "'[A]n evaluation of the probable outcome on the merits is not properly part of the certification decision.'" *Amgen* at *19 (quoting Advisory Committee's 2003 Note on sub. (c)(1) of Fed. Rule Civ. Proc. 23, 28 U.S. C. App., p. 144). The Court clarified that Rule 23 "requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen, Inc.,* 133 S.Ct. at 1191.

> Essentially, Amgen . . . would have us put the cart before the horse. To gain certification under Rule 23(b)(3), Amgen and the dissenters urge, [that plaintiffs] must first establish that it will win the fray. But the office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the "metho[d]" best suited to

35

adjudication of the controversy "fairly and efficiently."

*Amgen*, 133 S.Ct. at 1191.

The Court specifically rejected the same interpretation of *Wal-Mart* that is the basis for decertification in this case, explaining that "[a]lthough we have cautioned that a court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim,' (citing *Wal-Mart)*, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 133 S. Ct. at 1194-1195 (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974))); Advisory Committee's 2003 Note on subd. (c)(1) of Fed. Rule Civ. Proc. 23, 28 U.S.C. App., p. 144 ('[A]n evaluation of the probable outcome on the merits is not properly part of the certification decision.'"); *see also Ealy v. Pinkerton Government Services*, 514 Fed. Appx. 299, 306 (4th Cir. 2013) (Noting that *Amgen* "caution[s] that in a rigorous class certification analysis, '[m]erits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'"); *In re Whirlpool Corp. Front-Loading Washer Product Litigation*, 2013 U.S. App. LEXIS 14519, **22, 24 (6th Cir. 2013) ("In other

words, district courts may not "turn the class certification proceedings into a dress rehearsal for the trial on the merits.") (quoting *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 811 (7th Cir. 2012)).

This Court's mandate applied this same standard that the Supreme Court held to be proper in *Amgen*, holding that the question is "not whether the appellants have definitively proven disparate treatment and a disparate impact; rather, the question was whether the basis of appellants' discrimination claims was sufficient to support class certification." *Brown*, 576 F.3d at 156 (citing *Lilly*, 720 F.2d at 332).

> The dissent takes issue with our crediting the appellants' statistics. However, we emphasize that at this stage, we are dealing only with whether the appellants have presented sufficient statistical information to establish commonality. We must walk a fine line between a facial class certification assessment and an assessment on the merits, and the dissent has stepped to the other side. The dissent's critiques might very well discredit the appellants' statistics later, upon a full review of the merits, but the information that the appellants have presented is enough to allow them to get to that point.

*Brown*, 576 F.3d at 156 fn. 10.

Moreover, this Court applied the same "rigorous analysis" standard as *Wal-Mart* – that the court must be "'satisfied, after a rigorous analysis, that the prerequisite of Rule 23(a) have been satisfied.'" *Brown*, 576 F.3d at 152 (quoting *General Telephone Co. SW v. Falcon*, 457 U.S. 147, 161 (1982)); *Wal-Mart*, 131 S. Ct. at 2551-2552 (quoting *Falcon*, 457 U.S. at 160-161). Based on such standard,

37

this Court correctly found that the plaintiffs "presented valid statistical evidence that independently indicates a disparate impact and disparate treatment in job promotions at Nucor, and we reiterate that an in-depth assessment of the merits of appellants' claims at this stage would be improper." *Brown*, 576 F.3d at 156 & n. 10. The decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), did not even mention, much less decide any issue related to alternative statistical benchmarks when an employer destroys its bid records.

By contrast, the district court applied a standard more stringent than permitted by *Amgen*, 133 S. Ct. at 1194-1195. The district court's decision not to follow this Court's mandate rests on the supposition that plaintiffs must show they will *prevail* on the merits of a "general policy of discrimination" rather than simply establishing a common *question* that presents a *triable* issue of fact. Rejecting the clear statistical evidence of a disparity shown by the best available means was, in fact, to decide the merits of who is likely to prevail at trial, which is improper. The district court's role is limited to deciding whether there is a *triable* issue of common fact or law, not to decide the merits of such issue or who should prevail at trial. "The likelihood of the plaintiffs' success on the merits . . . is not relevant to the issue of whether certification is proper." *Thorn v. Jefferson Pilot Life Ins. Co.*, 445 F.3d 311. 319 (4th Cir. 2006). Who will prevail at trial reserved for a jury under the Seventh Amendment to the

Constitution.  *Mulligan v. South Carolina Dept. of Transp.*, 446 F.Supp.2d 446, 452

& n.6 (D.S.C. 2006) ("Challenges to the merits of Plaintiffs' claims would be more

appropriately raised in a motion for summary judgment.").

> ### C. The District Court Abused Its Discretion And Clearly Erred By Rejecting The Statistical Evidence That This Court Held Sufficient As A Matter Of Law

The district court made a fundamental factual mistake in assuming, without any

evidence, that the nine Change-of-Status records listed in the dissent to this Court's

mandate were part of the 27 promotions included in the statistical evidence.  *See* pp.

4-7 *supra*. Those nine Change-of-Status records involve just four persons – Tillman,

Kolesar, DeFilippo and Cecil — **none** of whom were one of the persons promoted to

the 27 jobs for 1999-2000 that were included in the statistical analysis. *Compare id.*

and *Brown*, 576 at 167-168 *with* JA1510 to Dr. Fox's deposition (JA1149,1279; *see*

*also* JA11005) and JA1403,1404,1408,1409,1410,14111416-1419,1435,1475,1476;

JA1279; JA10974,JA11005.  A comparison of the Change-of-Status forms listed in

the dissent and the decision below with the 27 promotions listed in Exhibit 2 to Dr.

Fox's deposition shows conclusively that they involve completely different people,

events and records than those analyzed in the statistical evidence of both parties. *Id.*;

*see* JA10974 at 2.

Because the nine Change-of-Status records questioned by Judge Houck were

not part of the statistics that this Court found sufficient for class certification, elimination of those nine records had no effect whatsoever on the statistical significance of the racial disparities established in the first appeal. Nucor offered no contrary evidence. The defendant is responsible for presenting contrary statistics if they exist. *Dothard v. Rawlinson*, 433 U.S. 321, 331 (1977) ("The plaintiffs in a case such as this are not required to exhaust every possible source of evidence, * * * If the employer discerns fallacies or deficiencies in the data offered by the plaintiff, he is free to adduce countervailing evidence of his own. In this case no such effort was made."). Doctors Fox and Bradley demonstrated that each of the 27 Change-of-Status records were in fact a promotion to one of the jobs that Nucor determined to be "similarly situated." JA1361 at 1403,1404,1411,1412.

It was also an egregious mistake – clear error – for the district court to assume that those nine Change-of-Status records were not promotions.  They clearly were. The 9 documents identified in the dissent reflect on their face that they involved just four persons, each of whom were "promoted" to one or more jobs shown on the face of these documents. JA8397-8399, 8404-8407, 8416, 8673-8677, 8701-8704. Tillman and Kolesar were promoted once (JA8398, 8405), while DeFilippo and Cecil were both promoted twice (JA8673-8677, 8701-8704), for a total of 6 unmistakable promotions.  *See* JA10974 and JA10998.

40

For example, the district court was mistaken to say that JA8397 reflects only a "completion of probation." JA10926 (quoting *Brown*, 576 F.3d at 167-168). It was obviously a completion of probation **for the promotion of Travis Tilman** that is reflected in JA8398 when it states Tillman was "promoted from Utilityman to Entry Operator on Rev. Mill #1 - until he moved to full grade 6 after successful completion of probation." *Compare* JA8397 *with* JA8398. None of these Tillman-related documents in JA8397-8399 were part of the 27 promotions identified and used by Dr. Fox.

The same mistake occurred with JA8416, which involved a "successful completion of probation" for Thomas Kolesar's *promotion* shown on the adjacent JA8405 which states that Kolesar was "promoted from RM Craneman to RM #1 Utilityman on July 11, 2001." JA 8404 is merely the follow-up pay raise 90 days later for that promotion. JA8391,8404-8405,8391,8416. Here again, none of Kolesar's documents were part of the 27 promotions included in the statistics for 1999-2000. *Compare* JA8404-8407, 8416 *with* JA1510.

The district court also was mistaken in adopting the dissent's statement that "[t]he remaining five reflect promotions of some type though only one (JA8673) identifies a promotion acquired through a bid process." JA10942 (quoting dissent, 576 F.3d at 167-68). That is a truism; the Change-of-Status forms do not address

bidding. They just show the Change-of-Status itself; Nucor destroyed the bid records for these promotions. Destroying the *bids* for promotions, however, did not destroy the Change-of-Status records which showed *who* was promoted.  JA1151,1501Thus, even if it is assumed *arguendo* that those nine records were included in the parties' respective statistics (they were not), those records involved *additional* promotions of Caucasian employees *beyond* the 27 promotions credited in the appellate mandate, and thus would have *increased* the statistical significance of the racial disparity in promotions rather than eliminating it.

### D. The District Court Erred And Abused Its Discretion By Repudiating The Anecdotal Evidence That This Circuit Held To Be Sufficient For Class Certification

This Court's mandate established that plaintiffs have "certainly presented compelling direct evidence of discrimination, such as denials of promotions when more junior white employees were granted promotions, denial of the ability to cross-train during regular shifts like their white counterparts, and a statement by a white supervisor that he would never promote a black employee." *Brown*, 576 F.2d at 153 (record citations omitted). The Court held that "[t]his evidence alone establishes common claims of discrimination worthy of class certification." *Id*.

The district court's finding that there is no pattern-or-practice evidence in the non-Beam Mill departments is directly contrary to the evidence and this Court's

42

mandate.  Plaintiffs  presented a combination of statistical, anecdotal and direct evidence showing that Nucor's promotion procedure is racially discriminatory throughout the plant.  First, the "similarly situated" promotions defined by Nucor included at least 70 instances that class members applied for promotions to non-Beam Mill jobs, as compared to only 25 bids for Beam Mill jobs.  JA1050-1051,1079,1085-1086,1118-1119,7765,7203-7840.  Sixteen class members testified by depositions and sworn declarations to facts that established racial discrimination in promotions throughout all the production departments, not just the Beam Mill. JA994-1124,1807-1888,2061-5668.  *See* pp. 8-17 *supra*.  The district court found that the seven named plaintiffs themselves were denied promotions in four of the six production departments. JA477-478,486-488. Eight additional class members testified to similar facts establishing promotion discrimination in all six production departments. *Id.*, *see* pp. 8-17 *supra*.

Second, statistically significant racial disparities in promotions were demonstrated in all six production departments. *See* pages 8-17, *supra*.  The district court acknowledged that "[s]tatistical evidence is critical because it may help the plaintiffs to 'identify' a  common mode of exercising discretion that pervades the entire company [or plant].'" JA10938-10939 (quoting *Wal-Mart*, 131 S. Ct. at 2554-55).  The error in rejecting that evidence has already been addressed.

43

Third, Nucor determined that a defined list of promotions across all production departments were "similarly situated" to one another for purposes of class certification. JA137-152; *see* pp. 6-7 *supra*. The district court found that there are at least "23 similar positions throughout the six production departments in addition to the jobs bid on by the plaintiffs." JA477-478,486-488. Those "similarly situated" jobs were spread proportionately across the Hot Mill, Cold Mill, Melting and Beam Mill, including at least 14 African-Americans denied promotions in ten job classifications in the Hot Mill; at least 14 African-Americans denied promotions in eleven job classifications in the Cold Mill; at least 12 African-American bidders denied promotions in nine job classifications in Melting; and at least 22 African-American bidders denied promotions in fourteen job classifications in the Beam Mill. JA7203-7840.

Fourth, this Court and the district court have found a racially hostile work environment that extends throughout all the production departments, not just the Beam Mill. JA10966-10968; *Brown*, 576 F.3d at 157-159. The evidence showed that the department managers and supervisors fostered a racially hostile work environment throughout the plant, not just the Beam Mill. JA993-1071; *see* pp. 27-28 *supra*. The racial hostility shown to exist was so obvious and long lasting that Judge Houck was compelled to find that it extended throughout all departments. JA10966-10972. This

Court mandated that such direct evidence and the overall pattern-or-practice should not be truncated by department, that "there is scant, if any, evidence that each of the departments is so autonomous as to justify classifying them as separate environments." *Brown*, 576 F.3d at 158.

Such plantwide evidence of racial hostility is just as much a part of the overall pattern-or-practice that infected black employees' promotion opportunities in those departments as any other form of direct evidence of racial hostility: "Evidence of the extent of the hostile environment was thus probative on the matter of managerial motives." *Williams v. ConAgra*, 378 F.3d 790, 794 (8th Cir. 2004); *Mullen v. Princess Anne Volunteer Fire Co., Inc.*, 853 F.2d 1130, 1134 (4th Cir. 1988) ("We reiterate . . . that the value of these statements in revealing state of mind may still be significant despite the fact that the statements did not relate to the specific decision at issue."). The weight of such evidence is a matter for the jury, not the Court. "Evidence of widespread toleration of racial harassment and disparate treatment condoned by management was relevant to its motive." *Id.*; *Robinson v. Runyon*, 149 F.3d 507, 512 (6th Cir. 1998) ("Here Robinson alleges that she was treated differently because of her race and in violation of Title VII. Evidence of a racially hostile atmosphere that was condoned by the supervisors in the CBMC clearly is relevant to such a proposition because it illustrates the attitudes of those supervisors."); *Conway v. Electro Switch*

45

*Corp.*, 825 F.2d 593, 597 (1st Cir. 1987)("circumstantial evidence of a discriminatory atmosphere . . . is relevant to the question of motive in considering a discrimination claim").[2]

This court has agreed with the foregoing line of precedent in holding that "incidents of harassment unrelated to the specific disputed action were properly admissible to show race-based intent." *Koskowski v. Hampton Sch. Bd.*, 77 Fed. Appx. 133, 147 (4th Cir. 2003) (citing favorably the foregoing precedent from Eighth precedent from Fifth, Sixth, Seventh, Eighth and Tenth Circuits); *Mullen v. Princess Anne Volunteer Fire Co., Inc.*, 853 F.2d 1130, 1134 (4th Cir. 1988).

Such systemic tolerance of racial hostility at Nucor came from the plant's General Manager, Ladd Hall, who admitted that it was his responsibility to investigate and respond to racial harassment or discrimination. JA1127; *see* pp. 17-

---

[2] *See also Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1147, 1423-1424 (7th Cir. 1986) ("The evidence disclosed a strong and persistent pattern of racial hostility of which management could hardly have been unaware and which increased the probability [of other forms of discrimination]."); *Estes v. Dick Smith Ford, Inc.*, 856 F.2d 1097, 1104 (8th Cir 1988) ("It defies common sense to say, as Ford implies, that evidence of an employer's discriminatory treatment of black customers might not have some bearing on the question of the same employer's motive in [relation to] a black employee."); *Polanco v. City of Austin, Texas*, 78 F.3d 968, 980 (5th Cir. 1996) ("Evidence of the APD's hostile treatment of and attitude toward Hispanics is probative of whether Polanco was terminated because of his nationality."); *Spulak v. K-Mart Corp.*, 894 F.2d 1150, 1156 (10th Cir. 1990) ("As a general rule, the testimony of other employees about their treatment by the defendant is relevant to the issue of the employer's discriminatory intent.").

24 *supra*. Systemic tolerance was shown by the fact that nothing was ever done about the multitude of racially hostile incidents reported by the putative class. JA1003-1004,1015-1016,1044-1045,1054-1056,1070,1105-1106,1111-1112,1123-1124,8537-8560.

Fifth, the district court ignored the fact there is a common, plantwide promotion procedure that includes substantial involvement by the plant's General Manager, Ladd Hall. *See* pp. 24-25 *supra*.

Sixth, the district court found that "[w]ithout question, the plaintiffs have presented evidence of a serious pattern of racial discrimination regarding promotions in the Beam Mill" that was sufficient to allow certification of "a promotion class consisting of all African-American employees who worked in the Beam Mill or who applied to work in the Beam Mill." *Id.* JA10953-10954. Considerable evidence demonstrated that the racial bias of Beam Mill managers migrated beyond that department and directly affected the promotion opportunities of African-Americans in other departments who wanted to promote into the Beam Mill and the promotional opportunities of Beam Mill employees who needed their own supervisor's and manager's recommendation and signature to be considered for promotions in other departments. *See* pp. 26-27 *supra*. The promotions that Nucor defines as "similarly situated" included a significant number of African-American bidders seeking transfer

47

to another department, including bids to transfer out of the Beam Mill to the Hot Mill (JA7237,7674), the Cold Mill (JA7353,7495,7645,7659) and to Melting (JA7334,7526,7530,7716). There were also bids from other departments seeking to transfer into the Cold Mill (JA7267,7210), the Hot Mill (JA7499), the Beam Mill (JA7617) and Melting (JA7721).

### E. The Decision In *Wal-Mart* Did Not Change The Law Applied In This Court's Prior Mandate

Nothing in *Wal-Mart* addressed direct evidence or opened the door to the district court rejecting this Court's ruling in the first appeal. *Wal-Mart* was silent on the type of direct evidence that this Court held to be significant proof of a general policy of discrimination. The *Wal-Mart* decision involved a sprawling, nation-wide class challenging promotions in more than 3,400 separate facilities on behalf of 1.5 million class members. This case, by contrast, involves just a single facility with less than 100 black employees at any one time.

Rather than changing the legal standard for commonality, the Court merely found that the *Wal-Mart* plaintiffs failed to offer sufficient evidence to create for reasons that even a question of whether a pattern-or-practice might exist. Unlike the statistics in this case which focus on a defined set of promotions in a single plant of limited size, the statistics in *Wal-Mart* were found deficient because they focused on

48

*regional* and *national* disparities rather than at the local store level. *Wal-Mart*, 131 S. Ct. at 2559-2556. There is no such regional-versus-local disconnect here. The statistics that this Court found sufficient focused on just promotions that Nucor itself selected and defined as "similarly situated" for purposes of class certification. *Brown*, 576 F.3d at 153-154, 156-157.

The anecdotal testimony in *Wal-Mart* was also found to be too limited in scope to support certification of a geographically dispersed class of l.5 million members. *Wal-Mart*, 131 S. Ct. at 2553. The Court relied upon its decision in *Teamsters*, 431 U.S. at 337, as an example of "significant" evidence of a pattern-or-practice of discrimination because "[t]he 40 anecdotals represented roughly one account for every eight members of the class" rather than the "1 for every 12,500" in *Wal-Mart*, 131 S. Ct. at 2555-2556. The current single-plant case involves far more robust anecdotal evidence from 16 class members for a plant that has approximately 70 to 80 members at any one time. Sixteen anecdotal witnesses in a small, single-plant case more than satisfies the one-in-eight sample found sufficient in *Wal-Mart* and *Teamsters*. This Circuit has already found that these 16 anecdotal witnesses presented "compelling evidence" of a plant-wide pattern-or-practice and hostile environment. *Brown*, 576 F.3d at 153.

Nucor also ignores the type of disparate impact claim that the Supreme Court

49

held to satisfy the commonality standard for class certification. *Wal-Mart*, 131 S. Ct. at 2554. This Court's mandate held that plaintiffs "presented valid statistical evidence that independently indicates a disparate impact . . . in promotions." *Brown*, 576 F.3d at 153-54, 1566-57. Nucor's own description of its promotion criteria shows that it is based on scored tests, assessments and rankings rather than purely subjective discretion like that in *Wal-Mart.* JA10502-10503.

### F.    Nucor's *Ex Parte* Affidavits From Selected Class Members Were Waived In The First Appeal And Not A Proper Basis For Not Following This Court's Mandate On Remand

The district court also erred by reaching back to  Nucor's *ex parte* affidavits from selected class members in 2003 that were not a part of the court's original denial of class certification in 2007, never mentioned by the parties or this Court in the first appeal in 2008-2009, never mentioned in the post-appeal petitions to this Court *en banc* or to the Supreme Court in 2009-2010, never mentioned by Nucor on remand in 2010-2011 and never mentioned by the district court in its certification of the promotion class on remand on February 17, 2011. JA9678-9707. It was not until September 11, 2012 that the district court first reached back on its own – *without warning* – to give those abandoned affidavits new life without giving plaintiffs notice or an opportunity to be heard. JA10950-10951.

Nucor's affidavits were also not a proper basis for the district court's decision

50

not to follow this Court's mandate. Lower courts are not permitted to reach back to evidence or argument that was waived or abandoned during a prior appeal. *See Doe v. Chao*, 511 F.3d 461, 465 (4th Cir. 2007) ("any issue that could have been but was not raised on appeal is waived and thus not remanded"); *United States v. Pileggi*, 703 F.3d 675, 680 (4th Cir. 2013) ("We unhesitatingly conclude that the mandate rule barred the district court from reconsidering the restitution order on remand. Neither party had raised the issue before this Court, and the government is not permitted to 'use the accident of a remand to raise . . . an issue that [it] could just as well have raised in the first appeal.'"); *S. Atl. Ltd. P'ship of Tenn., LP v. Riese*, 356 F.3d 576, 584 (4th Cir. 2004) ("[u]nder the mandate rule, a district court cannot reconsider issues the parties failed to raise on appeal"); *United States v. Kelly*, 64 Fed. Appx. 361, 365 (4th Cir. 2003) (Mandate enforced because issue on remand "had either been decided in the first appeal or waived because they were not raised on appeal."); *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993) ("The mandate rule also "forecloses litigation of issues decided by the district court but foregone on appeal or otherwise waived, for example because they were not raised in the district court."); *United States v. Barnes*, 660 F.3d 1000, 1006 (7th Cir. 2011); *United States v. Turner*, 436 Fed. Appx. 599, 601 (6th Cir. 2011).

Manifest injustice does not occur when a party could have raised evidence in

a prior appeal. *United States v. Becerra*, 155 F.3d 740, 755 (5th Cir. 1998) ("'the government cites no case where our court (or any court, for that matter) has found that a prior opinion works a manifest injustice where the party claiming injustice had all the means and incentive to provide the relevant information in the first appeal'").

### G.    Nucor's *Ex Parte* Affidavits Show That The Pattern-Or-Practice Extends Throughout All Six Production Departments

Even absent such waiver, the district court misconstrued what Nucor's *ex parte* affidavits actually said. There were more Nucor affidavits establishing a *prima facie* case in non-Beam Mill departments than there were from the Beam Mill. For example, the district court thought that a "significant majority" of Nucor's affiants from the Hot Mill denied knowing if race was the reason they were not promoted. JA10951. It ignored, however, that 14 affiants demonstrated facts sufficient to establish a *prima facie* case of promotion discrimination against themselves or others in the Hot Mill – that they applied, were qualified and were bypassed by a Caucasian employee for jobs traditionally held by white employees. JA5992-5995 (Barnes), 6113-6119 (Cills), 6137-6148 (Cobin), 6171-6174 (Dasgupta), 6258-6261 (Dunn), 6235-5233 (Grice), 6382-6386 (Harleston), 6437-6439 (Hunigan), 6452-6453 (Irving), 6504-6508 (Lawrence), 6722-6723 (Porcher), 6964, 6970-6971 (Turner), 6650-6656 (Nick), 6058 (Blanco). These 14 affidavits are an overwhelming majority

52

of Nucor's affidavits from Hot Mill employees and are in addition to the 14 promotion bids to Hot Mill jobs that were denied to plaintiffs' witnesses. *See* pp. 9 *supra*.

The same mistake was made in the district court's new finding that an "overwhelming majority" of Melt Shop employees denied knowing whether race was the actual reason they were denied promotions. At least eleven of Nucor's affiants from that department state facts that establish a *prima facie* case of racial discrimination in promotions – that they applied, were qualified and were bypassed by a white employee in a traditionally white job. JA5992-5995 (Barnes), 6007-6009 (Beaufort), 6078-6079 (Brockington), 6137-6148 (Cobin), 6171-6174 (Dasgupta), 6365-6372 (Hamilton), 6614-6617 (Middleton), 6747 (Jacob Ravenell), 6777-6779, 6783 (Rhode), 6944-6951) (Treadway), 7031-7034, 7036 (Wright). Those eleven affidavits were *additional* factual accounts that fit within this Court's mandate that there is sufficient evidence of a pattern-or-practice throughout all production departments, "such as denials of promotions when more junior white employees were granted promotions [and] denial of the ability to cross-train during regular shifts like their white counterparts." *Brown*, 576 F.3d at 153. The facts stated in these 14 Hot Mill affidavits and 11 affidavits from Melting fit within this same pattern-or-practice.

The district court chose not to follow the Court's mandate only because *some*

53

of Nucor's affiants stated that they had no way of really knowing what racial bias might exist in their supervisors' minds. This Court and the Supreme Court have held, however, that "[r]arely will there be 'eyewitnesses' testimony with regard to the employer's mental processes." *Warren v. Halstead Ind., Inc.*, 802 F.2d 746, 752-753 (4th Cir. 1986); *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716 (1983) ("There will seldom be 'eyewitnesses' testimony as to the employer's mental process."); *Mullen v. Princess Anne Volunteer Fire Co., Inc.*, 853 F.2d 1130, 1133 (4th Cir. 1988) (Noting "inherent difficulty of proving state of 'mind" and that "[t]here will seldom be 'eyewitness testimony as to the employer's mental process'" (quoting *Aiken*, *supra*). This Circuit has long held that proof of direct statements of decisionmakers' racial bias is not required. "Since no direct evidence of animus is necessary to prove employment discrimination, its absence hardly compels a factfinder to conclude that the employer did not discriminate." *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 855 (4th Cir. 2001); *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715 fn. 3 (1983) ("[T]he District Court should not have required Aikens to submit direct evidence of discriminatory intent."); *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1355 (4th Cir. 1995) ("[N]either we nor any other court that has required evidence of 'deliberateness' have ever 'insisted on 'smoking gun' evidence of employer intent.'").

The district court's "overwhelming majority" finding was also mistaken because the court counted affiants who had *just been hired* and not yet experienced promotion discrimination (JA6090,6602,6423-6431,6345,6196) or who *never bid* for a promotion for reasons of their own (JA6068 (Bowman), 6128 (Clinton), 6426 (Hudson), 6464 (Jamison), 6552 (Maharaj), 6464 (Middleton), 6824 (Roper), 6983 (Vanish), 6636 (Moore), 6904 (Singleton), 6023 (Black), 6275 (Edwards), 6288 (Gerena)), 6299 (Gethers), 6493 (Kiger), 6683 (Pinckney), 7008 (Webster).

The district court erred as a matter of law by applying a standard that looks to whether a numerical majority of witnesses knew their supervisor's motives to be discriminatory.   In *Wal-Mart*, the Supreme Court borrowed the 1-to-8 ratio of anecdotal witnesses from its decision in *Teamsters* and never suggested that class certification, or even trial on the merits, requires testimony from a majority of class members in order to establish a pattern-or-practice of racial discrimination.  *Wal-Mart*, 131 S. Ct. at 394-395; *Teamsters*, 431 U.S. at 337-338.  The Supreme Court's *Teamsters*' standard was applied to reverse decertification in similar circumstances in which half of a 240 person class disavowed promotion discrimination in *Cox v. American Cast Iron Pipe*, 784 F.2d 1546, 1554 (11th Cir. 1986), *cert. denied*, 479 U.S. 883 (1987).  The Court held that "'the fact that some class members might like the status quo will not defeat a claim on behalf of the class.'"  *Id.*   "Indications of non-

interest in a suit are simply 'inappropriate,' . . . 'at a class determination hearing.'" *Cox*, 784 F.2d at 1554.

The Supreme Court has held that a pattern-or-practice claim looks to the practice or pattern itself, not individualized promotion decisions. *Cooper*, 467 U.S. at 876, 881 ("'at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking.'"); *Teamsters*, 431 U.S. at 336, 360 ("At the initial 'liability' stage of a pattern-or-practice suit the [plaintiff] is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish a *prima facie* case that such a policy existed. * * * Without any further evidence from the [plaintiff], a court's finding of a pattern-or-practice justifies an award of prospective relief."); *Cox,*784 F.2d at 1556 ("[I]n stage one proceedings . . . the focus is the broad pattern and practice at issue, not the merits of individual claims."); *Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417. 425-427 (4th Cir. 2003). It is well recognized that the purpose of Rule 23 "might well be defeated by an attempt to decide a host of individual claims before any common question relating to liability has been resolved adversely to the defendant." *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 881(1984); *Teamsters,* 431 U.S. at 360-361.

The  same factual and legal errors undermine the district court's opinion that "7 of the 13 affidavits who worked in the Cold Mill, **not a single one** claimed to have been unfairly denied a promotion on the basis  or race." JA10950.  In fact, at least 7 of the 13 affiants Nucor selected from the Cold Mill gave facts stating a *prima facie* case of promotion discrimination – that they applied, were qualified and were bypassed by a Caucasian employee in a traditionally white job. JA6040-6041 (Blackwell), 6243-6253 (Dennard), 6637-6638 (Moore), 6995 (Watson), 6837 (Runnell), 6193-6195 (Marella-Scott).

Although the district court entered no findings against the sufficiency of the evidence for the other two productive departments – Shipping and Maintenance – there was ample evidence from Nucor's affidavits showing the pattern-or-practice extended into those departments.  JA6272-6282 (Edwards), 6663-6677 (Peeler), 6007-6009 (Beaufort), 6040-6041 (Blackwell), 6158 (Crummy), 6275-6277 (Edwards), 6565 (Major), 6850-6852 (Scott), 7021-7022 (Williams), 6297-6298, 6300-6301 (Gethers), 6494 (Kiger).

## H.    The Affidavits Taken  By Nucor's Attorneys Were Inherently Coercive and Misleading

Nucor's affidavits from class members must be construed in light of the inherently coercive circumstances in which they were obtained. Nucor's attorneys

appeared at the plant without warning to call black employees off the shop floor to take statements.  The attorneys solicited statements on the pretense that they were trying to investigate and remedy racial discrimination at the plant when, in fact, they later admitted that  they "intend[ed] to use the affidavits . . . in opposition to class certification, in support of [defendant's] dispositive motions, to impeach witnesses, and to show that prior alleged incidents of discrimination were never reported." JA9379-9380.  In other words, the affidavits were adversarial and to be used against the affiants. Nucor's written notice of the interview's purpose specifically represented that it merely wanted "to get to the bottom of this to determine what happened" and to do something about it.  JA6003 (example of written solicitation form tendered to class members). A very similar solicitation form has been held "deceptive" under Professional Rule 4.3 because it "impl[ied] that there is no underlying motive in obtaining  the  information and that the parties seeking such information are 'disinterested,' even though Rule 4.3 explicitly states that a lawyer shall not imply that he or she is disinterested." *In Re Air Crash Disaster Near Roselawn*, 909 F. Supp. 1116, 1123  (N.D. Ill. 1995).

*Ex parte* affidavits taken in this manner have been condemned as abusive and untrustworthy when, as here, "the employees were never told that the purpose of the interviews was to gather evidence to be used against the employees in a lawsuit."

*Quezada v. Schneider Logistics*, 2013 U.S. Dist. LEXIS 47632, **12-18 (C.D. Cal. Mar. 25, 2013). "Failing to inform the employees of the evidence-gathering purpose of the interviews rendered the communications fundamentally misleading and deceptive because the employees were unaware that the interview was taking place in an adversarial context, and that the employees' statements could be used to limit their right to relief." *Id.*; *see also Mevorah v. Wells Fargo Home Mtg.*, 2005 U.S.LEXIS 28615, *13-16 (N.D. Cal. 2005).

Other courts have similarly found held that "the ability of defense counsel to exert undue influence on those putative class members is considerable." *Braun v. Wal-Mart Stores, Inc.*, 2003 WL 1847695 *2 (Pa. Com. Pl.). "By its very nature, a potentially adversarial interview process between an employee and an employer and its lawyer is fraught with pitfalls for the employee, most notably the implied threat of loss of employment." *Id. See also Bublitz v. E. I. Dupont*, 196 F.R.D. 545, 548 (S.D. Iowa 2000) ("[T]he risk of coercion is particularly high and may be "inherent."); *Kleiner v. First National Bank*, 751 F.2d 1193, 1206 (11th Cir. 1985); *Abdallah v. Coca Cola Co.*, 186 F.R.D. 672, 678 (N.D. Ga. 1999) ("But simple reality suggests that the danger of coercion is real."); *Bowers v. The Bunker Hill Co.*, 689 F. Supp. 1032, 1034 (E.D. Wash. 1985) (". . . the imbalance in knowledge and skill . . . presents an extreme potential for prejudice to class members' rights."); *EEOC v.*

59

*Morgan Stanley & Co., Inc.*, 206 F. Supp. 2d 559, 562 (S.D. N.Y. 2002); *Ralph Oldsmobile, Inc. v. General Motors Corp.,* 2001 WL 1035132, at *3 (S.D.N.Y. Sept.7, 2001); *EEOC. v. Mitsubishi Motor Mfg. of America, Inc.,* 960 F.Supp. 164, 168 (C.D.Ill.1997); *In Re Air Crash Disaster Near Roselawn*, 909 F. Supp. 1116, 1123 (N.D. Ill. 1995); *McCallum v. CSX Transp.*, Inc., 149 F.R.D. 104 (M.D. N.C. (1993).

Professional Rule 4.3 states: "In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested." S. C. Rules of Professional Conduct, Rule 4.3. The official Comment to Rule 4.3 explains that laymen "might assume that a lawyer is disinterested" and that a lawyer should "explain that [his] client has interests opposed to those of the unrepresented person." That was not done here. The American Bar Association has required that lawyers "punctiliously comply with the requirements of Rule 4.3." *ABA Formal Opinion* #91-359; *see also ABA Informal Opinion* #908. Hazard & Hodes, THE LAW OF LAWYERING, §4.3:102.

The prejudice of Nucor's *ex parte* affidavits is shown by the much different testimony the affiants gave when deposed in an open forum. Earl Ravenell signed boilerplate language stating he knew of no racial hostility and was not interested in promotion, but when deposed outside Nucor's woodshed he described detailed

hostility and active efforts at promotion in the more central setting of his deposition. Ravenell Depo., JA4745,4749-4751,4761-4762,4764,4766-4768,4770-4777,4779-4780; JA1110-1113,6731.  The same thing occurred with Robyn Spann and Bernard Beaufort.  *Compare* JA 6935-6940 *with* Spann Depo. JA4192-4193,4196-4198,4201,4212-4214,4224-4225,4236,4241,4265,4270,4278,4288-4292,6929; *compare* JA6007-6012 *with* Bernard Beaufort Depo. JA4504-4508,4513,4515,4517,4521-4524,4535-4539,4542-4543,4566-4775.

## CONCLUSION

For all the foregoing reasons, the decertification of the promotion aspect of the class pattern-or-practice claims should be reversed and remanded with instructions to: (1) recertify the putative class of African-American employees from December 8, 1999 forward; and (2) to require production of the records surrounding all vacancies that have been posted or filled since December 8, 1999.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested and necessary.  The issues in this appeal require oral argument because:  (l) the appeal is not frivolous; (2) the dispositive set of issues presented have not been recently authoritatively decided; (3) the facts and legal arguments cannot be adequately presented in the briefs and record;  and (4) the decisional process will be significantly aided by oral argument.

Respectfully submitted this 30th day of September, 2013.

s/Robert L. Wiggins, Jr.
Robert L. Wiggins, Jr.
Ann K. Wiggins
Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building, 301 19th Street North
Birmingham, Alabama 35203
205-314-0500
205-254-1500 (facsimile)

Armand Derfner, Bar No. 502
D. Peters Wilborn, Jr., Bar No. 760
Derfner, Altman & Wilborn
575 King Street
P.O. Box 600
Charleston, S.C. 29402
(843) 723-9804
(843) 723-7446 (facsimile)

Attorneys for Plaintiffs-Appellants

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

**NO. 13-1779**              *Brown, et. al. v. Nucor, et al.*

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Certificate of Compliance With Type-Volume Limitations
Typeface Requirements, And Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32 (a) (7)(B) (i) because:

>   this brief contains 13,776 words, excluding parts of this brief exempted by Fed. R. App. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirement of Fed. R. App. P. 32(a)(6) because:

>   this brief has been prepared in a proportionally spaced typeface using WordPerfect 8 in 14 point Times New Roman.


                        s/Robert L. Wiggins, Jr.
                        Robert L. Wiggins, Jr.
                        Attorney for Plaintiffs-Appellants

Date: September 30, 2013

## <u>CERTIFICATE OF SERVICE</u>

I certify that on, September 30, 2013, I electronically filed with the Clerk's Office of the United States Court of Appeals for the Fourth Circuit the Plaintiffs-Appellants' principal brief, and further certify that I mailed this same date the required copies to the Clerk and  to opposing counsel.

s/Robert L. Wiggins, Jr.
OF COUNSEL

OPPOSING COUNSEL:

to:

Robert L. Hodges                    Cary A. Farris
John Tracy Walker IV                J. Shannon Gatlin
McGuire Woods LLP                   John K. Linker
One James Center                    ALANIZ & SCHRAEDER, LLP
901 East Cary Street                2500 City West Blvd., Suite 1000
Richmond, VA 23219                  Houston, TX 77042
Telephone Number: 804/775-7513      Telephone Number: 281/833-2200
Facsimile:  804/698-2082            Facsimile: 281/833-2240

John S. Wilkerson, III
Nosizi Ralephata
Attorneys at Law
TURNER, PADGET, GRAHAM & LANEY, P.A.
PO Box 22129
Charleston, South Carolina 29413
Telephone Number: 843/576-2801
Facsimile: 843/577-1631